IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GEORGE E. LOCKETT, JR., | : |
|           Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CITY OF EASTON, | :   CIVIL ACTION |
| | :   DOCKET NO. 20-4924 |
|           Defendant. | : |
| | : |
| | : |

**ANSWER AND AFFIRMATIVE DEFENSES
TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant City of Easton ("the City"), by and through its attorneys, MacMain, Connell & Leinhauser, hereby answers Plaintiff's First Amended Complaint as follows, denying each and every averment set forth therein except as expressly admitted below:

**I.    JURISDICTION AND VENUE**

    1-5.    Admitted.

    6.    Denied. The City specifically denies that Plaintiff is the only black police officer employed by the City. Moreover, at the time Plaintiff was hired, the acting Chief of Police was black. By way of further answer, during his tenure with the Easton Police Department, Plaintiff has worked with other black officers, Hispanic officers, Asian officers, and female officers and continues to do so today.

    7.    Admitted, upon information and belief.

    8.    Denied. The City specifically denies that no discipline was meted out and that Plaintiff was forced to report to Lieutenant Smith after the allegations were confirmed. On the contrary, immediately upon receiving notice of the comments allegedly posted by former Police Lieutenant Smith, the City investigated and verified that the comments appeared to have been

posted by an account belonging to Lieutenant Smith. The process of confirming this information and securing necessary evidence and interviews occurred rapidly, and the City placed Lieutenant Smith on leave pending further investigation. By way of further answer, Easton Police Chief Carl Scalzo and other members of the Easton Police Department command staff sought out Plaintiff to personally notify him of the allegations against Lieutenant Smith, the action taken, and the fact that the offensive social media comments that were allegedly made by Lieutenant Smith were completely contradictory to the attitudes, beliefs, and policies of the Easton Police Department. By way of further answer, Lieutenant Smith never returned from administrative leave and did not return to active duty for the Easton Police Department following the allegations' confirmation. While Lieutenant Smith was off on administrative leave, a thorough investigation was being conducted into the allegations. Lieutenant Smith chose to leave the employ of the City of Easton Police Department before the investigation was concluded, which was his legal right. The City of Easton is bound by employment law which requires all employees receive due process.

9-10. Admitted in part; denied in part. The City admits only that, shortly after being informed of the allegations against Lieutenant Smith, Plaintiff made unfounded allegations that Lieutenant Homoki maintained a book for the purposes of racially profiling individuals. The City denies the remaining averments contained in Paragraphs 9 and 10 of the Amended Complaint. The City denies that the book was known, commonly or otherwise, as the "black book." By way of further answer, the book was created in 2009, prior to the availability and implementation of digital tools such as Pennsylvania Justice Network ("JNET") and the availability of the Regional Intelligence Information Center ("RIIC") that police departments now use to track and identify individuals who have multiple aliases and/or no identification, and

such logbooks were commonly used by police departments across the country for this legitimate law enforcement purpose. At the time the book was created, the City saw an influx of gang members from New Jersey who were involved and responsible for numerous incidents in the City and who could not be identified. The approximately 60 individuals whose photographs are contained in the logbook are from all races and ethnicities, had multiple contacts with the Easton Police Department, and are responsible for or have been involved in over 1,200 incidents in the City. Individuals photographed and identified in the photo logbook have been involved in and responsible for such crimes as homicide, rape, robbery, weapons offenses, motor vehicle theft, and narcotics distribution. Indeed, after the City gave Plaintiff an opportunity to review the logbook at a post-investigation meeting, Plaintiff commented that, once he looked closely at the individuals in the book, he recognized many of the individuals photographed and stated that "all of these guys belong in here." This meeting was attended by Chief Scalzo, other members of the command staff, Human Resources Manager Marc Redding, and Plaintiff's union representative.

      11-12. Denied. The City denies that Lieutenant Homoki made the statements attributed to him in Paragraphs 11 and 12 of the Amended Complaint. By way of further answer, on June 15, 2015 the Plaintiff complained to Chief Carl Scalzo about the "patrol photo log" and advised that he heard Lieutenant Homoki order officers to stop people for no reason, photograph them, and place them in the patrol photo log. When further questioned in 2015 about hearing the order, Plaintiff pointed to his ear and confirmed to Chief Scalzo that he had heard the Lieutenant give this order "firsthand." During the formal investigation into Plaintiff's allegations, Plaintiff was interviewed by Lieutenant Herncane and Human Resources Manager Marc Redding. During this interview, which took place in or about July 2015, Plaintiff changed his story and told the investigators that he never actually heard Lieutenant Homoki give the order he alleged. Instead,

Plaintiff claimed that someone else told him that they had heard Lieutenant Homoki give the alleged order. When questioned why Plaintiff had previously told Chief Scalzo that he had heard Lieutenant Homoki give the order firsthand, he admitted again that he had heard it from someone else and never actually heard Lieutenant Homoki issue that order. When Plaintiff was asked who heard the order, he responded that he could not remember. To this day, not one person, including Plaintiff, has ever stated to Chief Scalzo, Lieutenant Herncane, any other member of the EPD Command Staff, or any other EPD supervisor that he or she heard Lieutenant Homoki give that order or make those statements, or indicated that this practice would have been acceptable within the Easton Police Department. Two separate investigations have been conducted in reference to this matter: one conducted internally in 2015 and one conducted by an independent outside law firm in 2018. During the 2015 investigation, conducted over a six-week period, both HR Director Redding and Lieutenant Herncane personally and individually interviewed every Easton police officer who was either supervised by Lieutenant Homoki from 2009 through 2015 or identified by Plaintiff as having information – totaling 25 out of 53 officers. Neither Officer Timothy Wagner nor Officer Michael Jeanette was supervised by Lieutenant Homoki during the relevant six-year period, neither was identified by Plaintiff as having information, and neither came forward and reported to any supervisor that Lieutenant Homoki made the statements alleged in Paragraphs 11 and 12, despite the fact that every officer in the EPD knew that the investigation sought exactly that information. Moreover, both Officer Wagner and Officer Jeanette were interviewed by the outside law firm in 2018, and neither reported to the outside investigator that Lieutenant Homoki made the alleged statements. On the contrary, every officer interviewed during both investigations has advised that he or she has never heard such an order or such statements, never used the patrol photo log in that manner, and understood the book to be used for identification

purposes. By way of further answer, after the investigation, Plaintiff approached Lieutenant Homoki, unsolicited, and apologized to him for making the complaint and told him: "I got played" by someone, and that is why he made the complaint. In a subsequent conversation with Lieutenant Herncane, Plaintiff made similar statements. In short, Plaintiff admitted to the City that he had never heard Lieutenant Homoki make the alleged statements and instead believed that someone else had misled him. It has also been established through extensive investigation, both internally and externally, that no officer has ever reported receiving such an order or hearing such statements from Lieutenant Homoki. Furthermore, Lieutenant Homoki adamantly denies ever giving any such order or making such a statement.

13-14. Admitted in part; denied in part. The City admits only that Lieutenant Brian Herncane, along with former City Human Resources Manager Marc Redding, investigated Plaintiff's allegations regarding the logbook. The City denies the remaining averments contained in Paragraphs 13 and 14 of the Amended Complaint. By way of further answer, the City specifically denies any implication or suggestion that Lieutenant Herncane's investigation was in any way biased or faulty. On the contrary, not only did the City's investigation reveal no wrongdoing on the part of Lieutenant Homoki, but an independent law firm, who, several years later, was tasked with investigating the complaint and investigating the investigation itself, reached the same conclusion.

15. Admitted in part; denied in part. The City admits that Lieutenant Herncane did advise the Plaintiff that he was aware of the patrol photo logbook during his interview; however, at no point did he state or behave as though he "saw no issue with it." By way of further answer, prior to the availability and implementation of digital resources, such as JNET and RIIC, that police departments now use to track and identify individuals who have multiple aliases and/or no

5

identification, such logbooks were commonly used by police departments across the country for this legitimate law enforcement purpose.

16. Admitted. By way of further answer, the City admits that no discipline was imposed against Lieutenant Homoki because no discipline was warranted.

17. Admitted in part; denied in part. The City admits only that, after the investigation was completed and it was determined that the logbook was created for legitimate law enforcement purposes and that Lieutenant Homoki never made the statements that Plaintiff alleged, Chief Scalzo cautioned Plaintiff about making unsupported allegations and expressed concern that making such unfounded, false, and offensive allegations could have serious and unwarranted negative consequences for Lieutenant Homoki. By way of further answer, Chief Scalzo specifically asked Plaintiff during a post-investigation meeting why Plaintiff had pointed to his ear and told Chief Scalzo that he had heard Lieutenant Homoki give the alleged order "firsthand," when Plaintiff, in fact, never heard Lieutenant Homoki give that order. Plaintiff responded that he listened to someone else who told him about the order. When asked who he received the information from, Plaintiff responded that he could not remember who told him. Chief Scalzo advised Plaintiff that claiming to have heard something "firsthand" when he did not, especially something as serious as this allegation, was frivolous at best. Chief Scalzo made this statement to impress upon Plaintiff the negative impact that an allegation like that could have on the falsely accused officer's life and career. Chief Scalzo further advised Plaintiff that making the allegation while having no idea whether this second-hand information was true, especially since he could not even remember who gave him the information, could be viewed as deceitful, at worst. The City denies the remaining averments contained in Paragraph 17 of the Amended Complaint.

18-22. Admitted.

23. Admitted in part; denied in part. The City admits only that, pursuant to the collective bargaining agreement, the City was required to conduct an investigation into the allegations against Lieutenant Smith and that, under the law, the City could not legally prohibit Lieutenant Smith from retiring while that investigation was being conducted, nor could the City legally strip Lieutenant Smith of the pension he had earned during his decades of service to the City. The City denies the remaining averments contained in Paragraph 23 of the Amended Complaint. By way of further answer, as evidenced by the fact that Lieutenant Smith had no intention to retire prior to the allegations being made against him, Lieutenant Smith's employment with the City ended as a result of the investigation into the allegations made against Lieutenant Smith.

24. Admitted. By way of further answer, during the meeting, a citizen asked Chief Scalzo a specific question about training requirements pertaining specifically to cultural diversity. Chief Scalzo responded by explaining the departmental training requirements and then going over some of the training the Easton Police Department has engaged in over the past several years. Chief Scalzo spoke explicitly about a multi-year cultural diversity program which the Department provided for all officers. In a subsequent meeting with Plaintiff and other members of City administration on September 30, 2016, Chief Scalzo explained his answer to Plaintiff. During this meeting, Chief Scalzo committed to doing even more cultural diversity training. In keeping with Chief Scalzo's promise, the City has provided additional cultural diversity training for the entire Easton Police Department every year since 2017. Every year, this training includes cultural diversity, anti-harassment in the workplace, anti-bias training, de-escalation and minimizing force, ethics in law enforcement, civil rights, communication skills,

precautions when using social media, responding to people with mental illness, and community policing.

26. Admitted in part; denied in part. The City admits only that, after the town hall meeting, Councilman Brown, Chief Scalzo, former Human Resources Manager Marc Redding, and City Administrator Luis Campos met with Plaintiff to attempt to address Plaintiff's concerns. The City denies the remaining averments contained in Paragraph 25 of the Amended Complaint. By way of further answer, the City specifically denies that Mayor Panto or any other City official made misleading statements at the town hall meeting.

26. Admitted in part; denied in part. The City admits only that Plaintiff questioned whether Lieutenant Smith was permitted to retire with a full pension. The City denies the remaining averments contained in Paragraph 26 of the Amended Complaint. By way of further answer, the City explained to Plaintiff that, pursuant to the collective bargaining agreement, the City was required to conduct an investigation into the allegations against Lieutenant Smith and that, under the law, the City could not legally prohibit Lieutenant Smith from retiring while that investigation was being conducted, nor could the City legally strip Lieutenant Smith of the pension he had earned during his decades of service to the City.

27. Admitted in part; denied in part. The City admits only that the City issued the policy in the fall of 2016. The City denies the remaining averments contained in Paragraph 27 of the Amended Complaint. By way of further answer, the City specifically denies that this policy was related to any statements made by Plaintiff. Notably, Plaintiff does not aver that he made any statements to an outside entity.

28. Admitted.

29. Denied. By way of further answer, the City specifically denies that this policy was related to any statements made by Plaintiff. Notably, Plaintiff does not aver that he made any statements to an outside entity.

30. Admitted in part; denied in part. The City admits only that Captain Lohenitz may have asked a question similar to the question attributed to him in Paragraph 30 of the Amended Complaint. The City denies the remaining averments contained in Paragraph 30 of the Amended Complaint. If Captain Lohenitz asked the question, it was out of concern for his fellow officer, for whom English is a second language, and not for any discriminatory purpose. By way of further answer, Captain Lohenitz is a 25-year veteran police officer with the Easton Police Department. Other than Plaintiff's allegations, Captain Lohenitz has never received a single complaint, nor has he ever been accused of having said or done anything to anyone to demean or insult a person because of their race, origin, ethnicity, sex, or any other reason.

31. Denied. The City adamantly denies that Captain Lohenitz made the statement alleged in Paragraph 31 of the Amended Complaint. By way of further answer, during an investigation into these allegations, the officer to whom the statement was allegedly made recanted the allegation.

32. Admitted in part; denied in part. The City admits only that Plaintiff made the statement alleged in Paragraph 32 of the Amended Complaint. The City adamantly denies that the City or any of its employees caused Plaintiff to suffer any unfair, abusive, or threatening behavior from any Easton Police Department personnel. By way of further answer, when Chief Scalzo received the performance evaluation with Plaintiff's allegations, he immediately contacted the City Administrator. Chief Scalzo requested an independent investigation be

conducted into the matter. The City Administrator granted this request, and an outside law firm convened an investigation.

33. Admitted in part; denied in part. The City admits only that Plaintiff submitted a complaint in August 2018 ("the August 2018 Complaint"). The City denies the remaining averments contained in Paragraph 33 of the Amended Complaint. The August 2018 Complaint is a document that speaks for itself, and any attempt to characterize it is denied. By way of further answer, the City fully and thoroughly investigated, through the utilization of an outside and independent law firm, the allegations made in the August 2018 Complaint and found no wrongdoing on the part of any employee, agent, or other personnel of the City.

34. Admitted in part; denied in part. The City admits only that it retained an outside law firm to investigate Plaintiff's August 2018 Complaint. The City denies the remaining averments contained in Paragraph 34 of the Amended Complaint. By way of further answer, the results of the investigation are contained in a document that speaks for itself, and any attempt to characterize it is denied.

35-36. Admitted.

37. Admitted in part; denied in part. The City only admits that, in the past, officers were, at times, permitted to pick sector assignments based on seniority. The City denies that this practice has been continuous for years or has been a departmental practice. Lieutenants and sergeants have always had the right to place officers in sectors based on need, seniority, or any other qualifying characteristic, i.e., special patrol initiatives. For example, in 2017 and before Plaintiff complained, the supervisors of another Platoon assigned sectors based on need and workload, not by seniority, as alleged by Plaintiff.

38. Admitted. By way of further answer, in late 2017, the Easton Police Department command staff was observing specific criminal and operational conditions that required departmental strategic maneuvers. One of the initiatives to be implemented was the assignment of sectors based on City and departmental needs for all platoons, as was being done by the "D" platoon at that time. This was done for several reasons, including: (1) eliminating complacency and helping keep officers safe and aware of new issues and crimes that were occurring in all sectors; (2) allowing officers to know all of the sectors intimately and, as a result, get to know many more City residents; (3) enabling the Department to fully utilize individual officers' strengths, such as traffic enforcement, community policing, and bike patrol, which could now be spread across the entire City and not reserved for a specific sector; and (4) allowing supervisors to manage their personnel better and utilize officers where it made the most sense based on need.

39-40. Denied. The City specifically denies that other patrol officers were permitted to choose their sector assignment after the change in policy or otherwise given preferential treatment over Plaintiff. On the contrary and by way of further answer, due solely to the fact that Plaintiff requested and received a later start time than the rest of the patrol officers on his shift, for a short time, sector assignments were distributed prior to Plaintiff's arrival at work. Once Plaintiff expressed concern about this procedure, adjustments were made to the assignment procedure. Currently, every officer's sector assignment is tracked and assigned to ensure every officer works in all sectors as evenly as possible. This process ensures that each officer will be assigned to sectors based solely on departmental need and results in a more balanced representation in all city sectors.

41. Admitted.

42. Admitted. By way of further answer, the City placed all patrol officers, not just Plaintiff, on a continuous rotation through each sector of the City so that all patrol officers would be familiar with every sector of the City and so that the workload was evenly and equally distributed among the patrol officers.

43. Admitted.

44-45. Admitted in part; denied in part. The City admits only that Plaintiff received a written evaluation in July 2019 ("the 2019 Evaluation") and that it was necessary to warn Plaintiff regarding the use of the "N word." By way of further answer, Plaintiff had used the "N" word in the workplace on a prior occasion and was verbally warned that the administration would not tolerate the utilization of such an offensive word by any officer. The City denies the remaining averments contained in Paragraphs 44 and 45 of the Amended Complaint. The July 2019 Evaluation is a document that speaks for itself, and any attempt to characterize it is denied.

46-47. Admitted in part; denied in part. The City admits that Plaintiff demonstrated a lack of knowledge regarding evidence packaging techniques and the location of marijuana test kits, which is just one example of the problems that can occur when an officer is continuously assigned to the slowest sectors in the city. This point clearly demonstrates one of the benefits of rotating sector assignments, so that all patrol officers are equipped with the knowledge and experience required to adequately patrol all sectors of the City, and not just those sectors with lower crime rates. The City denies the remaining averments contained in Paragraphs 46 and 47 of the Amended Complaint.

48-49. Denied. By way of further answer, the City adamantly denies that it or any of its employees, agents, or personnel retaliated against Plaintiff for any conduct, including complaints.

50. Admitted.

51-54. Denied. By way of further answer, the City specifically and adamantly denies that any of its officials, officers, employees, agents, or personnel engaged in racial discrimination or retaliated against Plaintiff or that Plaintiff has suffered any of the injuries or damages alleged. On the contrary, at all times, Plaintiff was treated fairly and in comportment with all City policies and procedures, and the City had legitimate, non-discriminatory, and non-retaliatory reasons for all employment actions taken with respect to Plaintiff.

55. Denied. Plaintiff has not attached a right-to-sue letter issued to Plaintiff by the EEOC to the Amended Complaint.

## Count I
## Alleged Discrimination on the Basis Of Race in Violation of
## Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2

56. The City incorporates its responses to the paragraphs above as though each were set out fully at length herein.

57. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel discriminated against Plaintiff because of his race.

58. The City admits only that Plaintiff brings the present action under 28 U.S.C. § 1331 and that this Court has jurisdiction over such a claim.

59. The City demands a jury trial.

WHEREFORE, the City requests that this Honorable Court enter judgment in its favor and against Plaintiff, together with costs, and any further relief deemed appropriate by this Court.

## Count II
## Alleged Retaliation in Violation of
## Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3

60. The City incorporates its responses to the paragraphs above as though each were set out fully at length herein.

61. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel either engaged in any unlawful employment practices or retaliated against Plaintiff.

62. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel either engaged in any unlawful employment practices or retaliated against Plaintiff because he participated in an investigation or for any other reason.

63. The City admits only that Plaintiff brings the present action under 28 U.S.C. § 1331 and that this Court has jurisdiction over such a claim.

64. The City demands a jury trial.

WHEREFORE, the City requests that this Honorable Court enter judgment in its favor and against Plaintiff, together with costs, and any further relief deemed appropriate by this Court.

**Count III**
**Alleged Discrimination Based Upon Race in Violation of**
**Section 5(a) of the Pennsylvania Human Relations Act, 43 P.S. § 955(a)**

65. The City incorporates its responses to the paragraphs above as though each were set out fully at length herein.

66. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel discriminated against Plaintiff because of his race or for any other reason.

67. The City admits only that Plaintiff brings the present action under 28 U.S.C. § 1367 and that this Court has jurisdiction over such a claim.

WHEREFORE, the City requests that this Honorable Court enter judgment in its favor and against Plaintiff, together with costs, and any further relief deemed appropriate by this Court.

**Count IV**
**Alleged Retaliation in Violation of Section 5(d) of the**
**Pennsylvania Human Relations Act, 43 P.S. § 955(d)**

68. The City incorporates its responses to the paragraphs above as though each were

set out fully at length herein.

69. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel either engaged in any unlawful employment practices or retaliated against Plaintiff.

70. Denied. The City adamantly denies that the City or any of its employees, agents, or personnel either engaged in any unlawful employment practices or retaliated against Plaintiff because he participated in an investigation or for any other reason.

71. The City admits only that Plaintiff brings the present action under 28 U.S.C. § 1367 and that this Court has jurisdiction over such a claim.

WHEREFORE, the City requests that this Honorable Court enter judgment in their favor and against Plaintiff, together with costs, and any further relief deemed appropriate by this Court.

## AFFIRMATIVE DEFENSES

The City has not yet obtained adequate discovery from Plaintiff in connection with this action to fully understand Plaintiff's Amended Complaint, and therefore, the City reserves the right to amend or otherwise supplement this pleading on that basis. Without limiting the generality of the foregoing, and without regard to whether the defenses set forth below are affirmative defenses within the meaning of Fed. R. Civ. P. 8(c), and without conceding that any such defense must be set forth in its Answer, the City states as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's First Amended Complaint fails to set forth a claim, in whole or in part, upon which relief can be granted under Title VII of the Civil Rights Act or under the Pennsylvania Human Relations Act.

## SECOND AFFIRMATIVE DEFENSE

At no time did the City discriminate against Plaintiff.

### THIRD AFFIRMATIVE DEFENSE

At no time did the City retaliate against Plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff failed to exhaust administrative remedies.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or by part by the applicable statute of limitations.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff suffered no economic damages as the result of any actions by the City.

### SEVENTH AFFIRMATIVE DEFENSE

The City is entitled to all defenses available under Title VII, 42 U.S.C. 2000(e), et seq., and said defenses are incorporated herein by reference.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff suffered no injury or damages as a result of any improper acts or omissions by the City.

### NINTH AFFIRMATIVE DEFENSE

Damages are limited by the terms of Title VII of the Civil Rights Act and Pennsylvania state law.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate his damages.

### ELEVENTH AFFIRMATIVE DEFENSE

Even if Plaintiff could prove a violation under 42 U.S.C. 2000e (and the City expressly denies such is the case), the City would have taken the same action and made the same decisions in the absence of the alleged impermissible motivating factor.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to any relief under Title VII of the Civil Rights Act of 1964, as amended, for any alleged conduct occurring more than 300 days before the filing of the charge of discrimination.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to any relief for, and his claims are barred by, any alleged acts or omissions that exceed the scope of the charges filed with EEOC.

### FOURTEENTH AFFIRMATIVE DEFENSE

The City had legitimate, non-discriminatory, and non-retaliatory reasons for all employment actions taken with respect to Plaintiff.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff was not subjected to any adverse employment action.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff cannot establish a claim of retaliation, as there is no causal connection between any alleged protected activity and the alleged adverse employment action.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Any claim contained in Plaintiff's First Amended Complaint which is not set forth in Plaintiff's operative EEOC charge has not been administratively exhausted, and therefore may not be legally pursued through this action, nor may it be the basis for obtaining relief in this case.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to punitive damages under the Pennsylvania Human Relations Act.

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part for failure to exhaust remedies under a

binding collective bargaining agreement.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and against Plaintiff, together with costs, and any further relief deemed appropriate by this Court.

**MacMAIN, CONNELL & LEINAHUSER, LLC**

Dated: <u>January 14, 2021</u>　　　By:　　*/s/ David J. MacMain*
　　　　　　　　　　　　　　　　　　　David J. MacMain
　　　　　　　　　　　　　　　　　　　Janelle E. Fulton
　　　　　　　　　　　　　　　　　　　Attorney I.D. Nos. 59320/80027
　　　　　　　　　　　　　　　　　　　433 W. Market Street, Suite 200
　　　　　　　　　　　　　　　　　　　West Chester, PA 19382
　　　　　　　　　　　　　　　　　　　*Attorneys for Defendant City of Easton*

**CERTIFICATE OF SERVICE**

I, David J. MacMain, Esquire, hereby certify that on this 14th day of January 2021, a copy of the foregoing *Answer and Affirmative Defenses to Plaintiff's First Amended Complaint* was served upon the following via ECF notification:

> Matthew J. Deschler, Esquire
> Littner, Deschler & Littner, Ltd.
> 512 North New Street
> Bethlehem, PA 18018
> *Attorney for Plaintiff*

**MacMAIN, CONNELL & LEINAHUSER, LLC**

By: */s/ David J. MacMain*
David J. MacMain
Janelle E. Fulton
Attorney I.D. Nos. 59320/80027
433 W. Market Street, Suite 200
West Chester, PA 19382
*Attorneys for Defendant City of Easton*